Search Warrant

# UNITED STATES DISTRICT COURT
### for the
### District of Arizona

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly Describe the property to be searched or identify the person by name and address)*<br>An iPhone 6S, rose gold in color, Model A1688, and an iPhone XR (PRODUCT) RED, red in color, collectively the "Target Cell Phones" that are in the possession of the FBI. including any containers attached to the Target Cell Phones – even if the containers are locked or sealed – that are capable of digitally holding item, including but not limited to media cards and SIM cards attached to the device. | Case No.  21-    9154 MB |

## SEARCH AND SEIZURE WARRANT

To:      FBI Special Agent Blake Childress, and any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the District of <u>Arizona.</u>
*(identify the person or describe the property to be searched and give its location)*:

### AS FURTHER DESCRIBED IN ATTACHMENT A.

The person or property to be searched, described above, is believed to conceal (identify the person or describe the property to be seized):

### AS SET FORTH IN ATTACHMENT B.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property.

YOU ARE COMMANDED to execute this warrant on or before     <u>7/1/2021</u>                        .
<i>(not to exceed 14 days)</i>

☐ in the daytime 6:00 a.m. to 10 p.m.
☒ at any time in the day or night as I find reasonable cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to <u>Any United States Magistrate Judge on Criminal duty in the District of Arizona.</u>

☐ I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*    ☐ for <u>30</u> days *(not to exceed 30)*
☐ until, the facts justifying, the later specific date of _____.

Date and time issued:     <u>6/17/2021 @ 4:08pm</u>            _____
<i>Judge's signature</i>

City and State: <u>Phoenix, Arizona</u>            <u>Honorable Eileen S. Willett, U.S. Magistrate Judge</u>
<i>Printed name and title</i>

## ATTACHMENT A

## PROPERTY TO BE SEARCHED

The location to be searched is an iPhone 6S, rose gold in color, Model A1688, and an iPhone XR (PRODUCT) RED, red in color, collectively the **"Target Cell Phones"** that are in the possession of the FBI.  This location includes any containers attached to the **Target Cell Phones** – even if the containers are locked or sealed – that are capable of digitally holding items within the scope of Attachment B.  Such containers include, but are not limited to, media cards and SIM cards attached to the device.

**ATTACHMENT B**

**PARTICULAR THINGS TO BE SEIZED**

All information that constitutes evidence, fruits, contraband and instrumentalities of violations of Title 18 U.S.C § 1201 (Kidnapping), Title 18 U.S.C § 2251 (Sexual Exploitation of Children), Title 18 U.S.C § 2252 (Activities Involving the Sexual Exploitation of Children), Title 18 U.S.C § 2422(b) (Coercion and Enticement), and Title 18 U.S.C § 2423 (Transportation of a Minor With Intent to Engage in Illegal Sexual Activity) including but not limited to:.

(a) Evidence of ownership of the device or any digital information contained therein;

(b) All contact lists, call history, internet browser history, applications, address books, and stored telephone numbers or email addresses;

(c) Any and all emails, text messages, or other electronic communications related to acts of prostitution, or to the sexual exploitation of minors, including but not limited to, solicitation, recruitment, enticement, coercion, etcetera;

(d) Any and all images, videos, or other visual depictions of minors engaged in sexually explicit activity in any format;

(e) Any items, images, videos, documents, communications, records, or information related to the distribution, receipt, production, or possession of the sexual exploitation of children or visual depictions of minors engaged in sexually explicit activity;

(f) All screen names, usernames, and true names of individuals who may have operated as the source of the sexual exploitation of children or the visual depictions of minors engaged in sexually explicit activity, in any format;

(g) Any evidence of who used, owned, or controlled the device at the time the items described herein were created, edited, viewed, or deleted, such as logs, registry entries, saved usernames and passwords, browsing history, bookmarks, or metadata;

(h) Any GPS, tracking, or other locations services which would show the location of the device at any time acts related to prostitution, sexual exploitation of children or the capturing of visual depictions of minors engaged in sexually explicit activities, were being conducted.

Application for a Search Warrant

# UNITED STATES DISTRICT COURT
for the
District of Arizona

In the Matter of the Search of
*(Briefly Describe the property to be searched or identify the person by name and address*

An iPhone 6S, rose gold in color, Model A1688, and an iPhone XR (PRODUCT) RED, red in color, collectively the "Target Cell Phones" that are in the possession of the FBI. including any containers attached to the Target Cell Phones – even if the containers are locked or sealed – that are capable of digitally holding item, including but not limited to media cards and SIM cards attached to the device.

Case No. 21-  9154 MB

## APPLICATION AND AFFIDAVIT FOR A SEARCH WARRANT

I, FBI Special Agent Blake Childress, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property (*identify the person or describe the property to be searched and give its location*):

### As further described in Attachment A.

Located in the District of <u>Arizona</u>, there is now concealed (*identify the person or describe the property to be seized*): The person or property to be searched, described above, is believed to conceal (identify the person or describe the property to be seized):

### As set forth in Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☒ evidence of a crime;
☒ contraband, fruits of crime, or other items illegally possessed;
☒ property designed for use, intended for use, or used in committing a crime;
☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

18 U.S.C § 2422(b), Coercion and Enticement
18 U.S.C.§ 1201, Kidnapping
18 U.S.C.§ 2423(a), Transportation of a Minor with Intent to Engage in Criminal Sexual Activity
18 U.S.C § 2251, Sexual Exploitation of Children
18 U.S.C § 2252, Activities Involving the Sexual Exploitation of Children

The application is based on these facts:

**The Affidavit of FBI Special Agent Blake Childress is set forth and incorporated herein by reference.**

☒ Continued on the attached sheet.
☐ Delayed notice of ____ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

Reviewed by AUSA – Erica Seger___ ERICA SEGER Digitally signed by ERICA SEGER Date: 2021.06.17 11:07:45 -07'00'

_____
*Applicant's Signature*
*Blake Childress, FBI Special Agent*
*Printed name and title*

Date and time issued: 6/17/2021 @4:08pm _____

_____
*Judge's signature*
Honorable Eileen S. Willett, U.S. Magistrate Judge
*Printed name and title*

City and State: <u>Phoenix, Arizona</u>_____

## ATTACHMENT A

## PROPERTY TO BE SEARCHED

The location to be searched is an iPhone 6S, rose gold in color, Model A1688, and an iPhone XR (PRODUCT) RED, red in color, collectively the "**Target Cell Phones**" that are in the possession of the FBI.  This location includes any containers attached to the **Target Cell Phones** – even if the containers are locked or sealed – that are capable of digitally holding items within the scope of Attachment B.  Such containers include, but are not limited to, media cards and SIM cards attached to the device.

## ATTACHMENT B

## PARTICULAR THINGS TO BE SEIZED

All information that constitutes evidence, fruits, contraband and instrumentalities of violations of Title 18 U.S.C § 1201 (Kidnapping), Title 18 U.S.C § 2251 (Sexual Exploitation of Children),  Title 18 U.S.C § 2252 (Activities Involving the Sexual Exploitation of Children), Title 18 U.S.C § 2422(b) (Coercion and Enticement), and Title 18 U.S.C § 2423 (Transportation of a Minor With Intent to Engage in Illegal Sexual Activity) including but not limited to:.

(a) Evidence of ownership of the device or any digital information contained therein;

(b) All contact lists, call history, internet browser history, applications, address books, and stored telephone numbers or email addresses;

(c) Any and all emails, text messages, or other electronic communications related to acts of prostitution, or to the sexual exploitation of minors, including but not limited to, solicitation, recruitment, enticement, coercion, etcetera;

(d) Any and all images, videos, or other visual depictions of minors engaged in sexually explicit activity in any format;

(e) Any items, images, videos, documents, communications, records, or information related to the distribution, receipt, production, or possession of the sexual exploitation of children or visual depictions of minors engaged in sexually explicit activity;

(f) All screen names, usernames, and true names of individuals who may have operated as the source of the sexual exploitation of children or the visual depictions of minors engaged in sexually explicit activity, in any format;

(g) Any evidence of who used, owned, or controlled the device at the time the items described herein were created, edited, viewed, or deleted, such as logs, registry entries, saved usernames and passwords, browsing history, bookmarks, or metadata;

(h) Any GPS, tracking, or other locations services which would show the location of the device at any time acts related to prostitution, sexual exploitation of children or the capturing of visual depictions of minors engaged in sexually explicit activities, were being conducted.

**ATTACHMENT C**

**AFFIDAVIT IN SUPPORT OF APPLICATION FOR SEARCH WARRANT**

1.  I, Blake H. Childress, being duly sworn, hereby depose and state as follows:

## <u>INTRODUCTION</u>

2.      Your Affiant is a Special Agent with the Federal Bureau of Investigation (FBI), assigned to the Phoenix Division.  Your Affiant has been employed since November 2009 and was assigned to the Human Trafficking Squad between July 2015 and February 2021. While employed by the FBI, your Affiant has been tasked with investigating violations of the United States Code, including but not limited to, domestic sex trafficking, juvenile sex trafficking, international sex trafficking, and kidnapping.

3.      This affidavit is submitted pursuant to Federal Rule of Criminal Procedure 41 in support of an application for a search and seizure warrant related to the property more fully described at Attachment A, specifically a iPhone 6S, rose gold in color, Model A1688, and an iPhone XR (PRODUCT) RED, red in color, collectively the **"Target Cell Phones"**, used by and/or associated with a female juvenile victim hereinafter identified as SM, in order to extract the electronically stored information set forth in Attachment B, which represents evidence and/or instrumentalities of the criminal violations further described below.  The full description of the property to be searched is found in Attachment A and is incorporated herein by reference as if fully restated.

4.      The facts in this Affidavit come from my personal observations, my training and experience, and information obtained from other agents, officers, investigators and witnesses. This Affidavit is intended to show merely that there is sufficient probable cause

1

for the requested search and seizure warrant and does not set forth all of my knowledge about this matter.

5.      Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that DEVAUGHN RILEY, S.M. and others known and unknown, violated Title 18 U.S.C § 1201 (Kidnapping), Title 18 U.S.C § 2251 (Sexual Exploitation of Children),  Title 18 U.S.C § 2252 (Activities Involving the Sexual Exploitation of Children), Title 18 U.S.C § 2422(b) (Coercion and Enticement), and Title 18 U.S.C § 2423 (Transportation of a Minor With Intent to Engage in Illegal Sexual Activity).  There is also probable cause that evidence of these crimes will be found in the cellular telephone device seized from S.M. on December 21, 2020.  Accordingly, this application requests authority to search the accounts described in Attachment A for evidence of these crimes, as described in Attachment B.

## DIGITAL EVIDENCE STORED WITHIN A CELLULAR TELEPHONE

6.      As described in Attachment B, this application seeks permission to search for records and information that might be found in the contents of the **Target Cell Phones**. Thus, the warrant applied for would authorize the copying of electronically stored information under Rule 41(e)(2)(B).

7.      Your Affiant submits that there is probable cause to believe records and information relevant to the criminal violations set forth in this Affidavit will be stored on the **Target Cell Phones** for the following reasons:

8.      Based on my knowledge and training and in consultation with other experienced investigators, your affiant knows that a cell phone, cellular telephone, or mobile telephone is a handheld wireless device used for voice communication through radio signals.  These

2

telephones send signals through networks of transmitters/receivers called "cells," enabling communication with other cellular telephones and traditional "land line" telephones. A cellular telephone usually includes a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, cellular telephones now offer a broad range of capabilities. These capabilities include: storing names, phone numbers, addresses and other contact information in electronic "address books" or "contact lists;" sending, receiving, and storing text messages, multimedia messages and email; taking, sending, receiving and storing still photographs and moving video; storing and playing back audio files; storing dates, notes, appointments, and other information on personal calendars; accessing social media sites and applications; and accessing and downloading information from the Internet. With the capability to access the Internet, data files, logs and other information are often stored or maintained on the cellular telephone. Cellular telephones may also include global positioning system (GPS) technology for determining location of the device. Additionally, most cellular telephones offer the ability to run applications or computer software developed for use on mobile devices. These applications give cellular telephones many of the same capabilities as personal computers. It is common for cellular telephone applications to utilize or keep the GPS or location history information. Cellular telephones and mobile devices can be used to store data and files, either on internal storage media or on removable media such as a memory card.

9.      Based on your affiant's training and experience, individuals rely heavily on their cellular telephones and mobile communications in their day-to-day activities and actions. These communications are often in the form of telephone calls, voice messages, SMS text

3

messages, mobile messaging service applications, photo sharing, social media, and other similar communications.  Records and copies of such communications are often kept on the cellular telephone or mobile device.  Individuals also rely heavily on their cellular telephones and mobile devices to maintain their "address books" and "contact lists" and for notetaking, calendaring, and navigation.

10.      Your affiant knows that when an individual uses a cellular telephone, the cellular telephone may serve both as an instrumentality for committing the crime and also as a storage medium for evidence of the crime.  The cellular telephone is an instrumentality of the crime because it is used as a means of committing the criminal offense.  The cellular telephone is also likely to be a storage medium for evidence of crime.  From my training and experience, your affiant believes that a cellular telephone used to commit a crime of this type may contain: data that is evidence of how the cellular telephone was used; data that was sent or received; notes as to how the criminal conduct was achieved; records of Internet discussions about the crime; and other records that indicate the nature of the offense.

11.      Based on my knowledge, training, and experience, your affiant knows that electronic files or remnants of such files can be recovered months or even years after they have been downloaded onto a cellular telephone, deleted, or viewed via the Internet. Electronic files downloaded to a cellular telephone can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools.  This is so because when a person "deletes" a file on a cellular telephone, the data contained in the file does not actually disappear; rather, that data remains on the cellular telephone until it is overwritten by new data.

4

12.     As further described in Attachment B, this application seeks permission to locate not only electronic files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how the cellular telephone was used, the purpose of the use, who used it, and when.  There is probable cause to believe that this forensic electronic evidence will be found in the contents of the **Target Cell Phones** because:

a. Data in a cellular telephone can provide evidence of a file that was once in the contents of the cellular telephone but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

b. As explained herein, information stored within a cellular telephone may provide crucial evidence of the "who, what, where, when, why, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element, or alternatively, to exclude the innocent from further suspicion.  In my training and experience, information stored within electronic storage medium (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, Internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the cellular telephone.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the cellular telephone was remotely accessed, thus inculpating or

exculpating the owner.  Further, activity on a cellular telephone can indicate how and when the cellular telephone was accessed or used.

13.    Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant your affiant is applying for would permit imaging or otherwise copying the contents of the **Target Cell Phones**, including the use of computer-assisted scans.

## CAPABILITES AND FEATURES OF DEVICES

14.    Based on your affiant's training, experience and research, the **Target Cell Phones** are Apple iPhones which utilize an iOS based operating system. The iOS operating system is a secure mobile operating system designed to protect your privacy. The **Target Cell Phones** have a built-in camera capable of capturing photos and video. The **Target Cell Phones** are capable of accessing the internet through the home screen of the respective devices. The **Target Cell Phones** are also Wi-Fi equip and hotspot ready to access the internet wirelessly, where available, through wireless Internet routers. The **Target Cell Phones** also have GPS capabilities. This GPS information allows the **Target Cell Phones** to track its location around the world. The **Target Cell Phones** also have Bluetooth connectivity allowing the devices to access various Bluetooth ready devices. The **Target Cell Phones** are also capable of syncing to a computer, laptop or other electronic device. The ability to sync to a computer, laptop or other electronic device allows the media contained within the **Target Cell Phones** to be upload other devices.

## PROBABLE CAUSE

15.    On December 21, 2020, Scottsdale Police Department (SPD) received a 911 call from the Days Inn and Suites hotel, located at 7330 N. Pima Rd, Scottsdale, Arizona regarding a disturbance.  Upon arriving at the scene, SPD Officer Lesser met with hotel

manager Adam Hoaglund near a dark grey Toyota Highlander SUV bearing Arizona Tag: CWL0801. SPD Officer Lesser noted the SUV had a shattered rear windshield and it appeared all four of its tires had been slashed and were deflated. During an interview with Hoaglund, he stated the individuals involved in the disturbance, who had left in a silver Nissan Altima, had tried to hit the front desk clerk, Trisha Core, with their vehicle after accusing other unknown individuals of child abduction. Hoaglund believed the incident was related to room numbers 411 and 414, which had recently been booked by an individual identified as DeVaughn Riley. Hoaglund also stated the group of individuals who had left the scene mentioned that "DeVaughn" was "smoking up meth with juveniles in the rooms."

16.    SPD officers then responded to room numbers 411 and 414 knowing the disturbance may have involved a child abduction and the possibility that additional child victims were in hotel rooms whose welfare could be in jeopardy. Prior to making entry into the two rooms, SPD officers observed and subsequently identified Riley and a juvenile (hereinafter identified as SM) sitting outside of room 414. SPD officers then knocked and announced on the door to room 411. After receiving no response to the knocking and announcements, but distinctly hearing people talking to each other in hushed tones, SPD officers made entry into room 411. SPD officers located and identified two juveniles (hereinafter identified as NO and JM.)

17.    SPD Officer Lesser subsequently conducted an interview of NO at the hotel. NO said she was fourteen years of age and was from San Diego, California. NO subsequently heard another officer mention the name "Onna" and then NO admitted that Onna, later fully identified as LM, had also been staying in room 411. LM was the female that had

7

been taken from the hotel by people purporting to be her family.

18.         SPD Detective Kalkbrenner conducted an interview of JM at the hotel.  At the time of the interview, JM had a cellular telephone in her possession that belonged to her.  JM said the phone did not work but provided the passcode for the phone.  Detective Kalkbrenner took custody of the cellular telephone as potential evidence.  During the interview, JM confirmed she was fifteen years of age and that she lived in California with her grandma.  JM said she let her grandma know she was going to be with her friend "Jasmine" (later identified as SM) for a few days, but admitted she did not tell her grandma she would be leaving the state.  JM initially said "they" did not make her do anything where she had to "have sex for money."  However, JM later admitted to having condoms in her backpack that were provided by SM.  JM said SM gave her the condoms "to make money" by having sex.  JM thought this conversation occurred while they were in the car and the conversation was between SM, LM, and JM.  JM also said that when SM gave her the condoms, SM was not forcing her to do it, but said if JM wanted to, it was ok.  JM denied ever having sex with anyone for money, but confirmed the purpose of the trip was for her to meet up with people to have sex for money.  JM said LM came on the trip for the purpose of meeting up with people to have sex for money, but NO was not there to participate in those activities.

19.         JM stated SM had taken pictures of her about two weeks ago.  JM said she was wearing underwear and a bra when the pictures were taken.  The pictures were taken in a hotel room and SM instructed JM on how to stand.  JM later admitted to having sex with someone for money and this occurred approximately three weeks ago.  JM guessed there were about three people she had met with and after each sexual encounter, she gave the

8

money to SM.  These encounters occurred in San Diego and Los Angeles, California.

20.      JM further explained that prior to coming to Arizona, they were in Los Angeles. SM picked her up from her home in San Diego and then everyone went to Los Angeles before coming to Arizona.  JM said she had engaged in prostitution a few different times with SM, but that it was not SM's fault.  SM explained to JM how everything worked, but she let JM decide if she wanted to participate.

21.      At the conclusion of their respective interviews, SPD transported JM and NO to the Scottsdale Family Advocacy Center in Scottsdale, Arizona.

22.      SPD Detective Halterman, conducted an interview of Riley at the hotel.  Riley stated he is currently employed as an active duty member of the United States Navy, stationed at the Naval Base San Diego.  Riley confirmed he was the renter of the damaged Toyota SUV.  Riley also confirmed he had driven from San Diego to Arizona with SM, NO, and JM.  LM was also with them prior to the incident that had just occurred at the hotel.  Riley stated SM was his girlfriend and they had been together for four or five months.  Riley thought LM was eighteen years of age because that was what LM had told him.  After arriving at the hotel in Scottsdale, LM's aunt and another female were at his vehicle and they were accusing him of "kidnapping" LM.  A black female that was with LM's aunt slashed the tires of his rental vehicle and smashed out the back window.

23.      Riley later stated he believed NO was sixteen or seventeen years of age and that JM was fifteen or sixteen years of age.  Riley said he did not explicitly have permission from either of their parents to bring them to Arizona, but he assumed it was okay since they had hung out in the past.

24.      At this time during the interview of Riley, Detective Halterman was advised of the

9

disclosures made by JM to Detective Kalkbrenner. Detective Halterman asked Riley if they were in Arizona so the girls could have sex with men for money. Riley said no. Detective Halterman asked if he was arranging/pandering prostitution with the girls. Riley said no. Detective Halterman asked if he would find evidence of child prostitution in either of the hotel rooms, inside the vehicle, or on his cellular telephone. Riley said no. Detective Halterman confirmed that a black colored iPhone XS Max cellular telephone that was in Riley's possession when he was initially contacted by SPD, belonged to him. Riley denied consent for Detective Halterman to search his iPhone. Detective Halterman then instructed SPD officers to place Riley and SM under arrest for custodial interference. Riley and SM were transported to the Scottsdale City Jail. Detective Halterman was then provided with two additional iPhones that he learned belonged to SM. The two iPhones that belonged to SM are identified as an iPhone 6S, rose gold in color, Model A1688, and an iPhone XR (PRODUCT) RED, red in color. The cellular telephones were later placed into Scottsdale PD's evidence and were assigned Property ID: 1353010 and 1353011 respectively.

25. After Riley arrived at the Scottsdale City Jail, photographs of Riley were taken. Depicted in the several of the photographs were tattoos on Riley's upper right arm and his upper and lower left arm. Close up photographs were also taken of the tattoos on Riley's right and left arm.

26. Once JM arrived at the Scottsdale Family Advocacy Center, Detective Kalkbrenner conducted another interview with JM. During the interview, JM said she was first introduced to prostitution a few of weeks ago by SM. She was feeling depressed, so she called SM and told her she wanted to hang out and make some money. LM thought they were going to make money by posting ads online to scam people and not ads for

10

prostitution.  SM picked JM up at her grandma's house and they went to a Days Inn hotel in San Diego.  However, SM started taking pictures of JM holding her boobs and different poses.  She did not know how SM did it, but people started coming to see JM.  JM ended up meeting with three different people.  She felt very guilty and uncomfortable, so she wanted to stop doing it.  In the pictures, JM was wearing underwear or a bra.  Some of the pictures taken of JM did not show her face or her breasts.  JM stated the pictures were taken by SM in the hotel room and SM used one of her iPhones.  JM thought SM had a couple of iPhones.  JM thought SM posted the ads, but she did not know where they the ads were posted.

27.      After the ads were posted, they started getting text messages from tricks.  Based on your affiant's training and experience, a "trick" or "tricc" is an individual or a customer that is looking to pay money for sexual acts.  JM explained SM would talk to the tricks and arrange for them to meet.  JM thought the tricks would text one of SM's phones.  The first trick sent a text message to SM and told her he wanted a blowjob and then to have sex.  JM said when he arrived at the door, he came in and handed JM the money.  He then got undressed and got on the bed.  JM stated she then gave him head and she did not have any clothes on.  Based on your affiant's training and experience, the term "head" is used to describe the sexual act of a blowjob or oral sex.  Afterwards, they had sex.  Once the trick left, JM gave SM the money.

28.      JM explained that the first time she had sex for money, she was accompanied by SM.  This was a few days before they all drove to Los Angeles and then to Arizona.  JM stated that when they drove to Los Angeles, she did not meet with anyone to have sex for money because she was mad and she just wanted to go home.  JM kept telling SM she

11

wanted to go home.  After staying one night in Los Angeles, they left and drove to Arizona.
JM did not know they were going to Arizona until they stopped at a gas station.  Once they
arrived at the Days Inn hotel in Scottsdale, they checked into two rooms.  JM thought they
arrived around 5:00 a.m. or 6:00 a.m.  JM, NO, and LM stayed in one of the rooms and SM
and Riley stayed in the other.  They were not there long before the police arrived.

29.       On December 21, 2020, Detective Halterman authored a state search warrant
affidavit and subsequently obtained a state search warrant for the five cellular telephones
that were seized at the time of the incident.  The cellular telephones are described as
follows:

   a.  Black iPhone XS Max in a plastic case owned by Riley;

   b.  Rose Gold iPhone S in a clear and black case with a cracked screen protector found
       in the possession of SM;

   c.  Red iPhone XR in a sparkle colored case found in the possession of SM;

   d.  Apple 7 Plus in a pink unicorn case found in the possession of a juvenile victim in
       this matter;

   e.  Black Apple iPhone in a black case found in the possession of a juvenile victim in
       this matter;

30.       The cellular telephones seized by Detective Halterman were provided to your
affiant on February 11, 2021, and are maintained in evidence by the FBI.

31.       The cellular telephones belonging to Riley, JM and NO were later imaged by
Matthew MacArthur, SPD Forensic Computer Examiner.  The two cellular telephones
belonging to SM were not imaged because the codes to unlock them were unknown at that
time.  All five cellular telephones as well as the digital forensic extractions of three of the

12

devices were provided to your affiant by SPD on February 17, 2021.

32.      Your affiant reviewed the digital extraction of the iPhone XS Max cellular telephone belonging to Riley.  During the review, your affiant reviewed the "Extraction Summary" and noted the device was associated with Apple ID devaughnriley6@icloud.com and had an assigned telephone number of (504) 813-7568.

33.      On or about March 3, 2021, your affiant conducted open source Internet searches for the cellular provider for telephone number (504) 813-7568.  The results listed Sprint as the provider.

34.      Your affiant also reviewed text message communications between the iPhone XS Max and a telephone contact named "Trench Bitch" with a telephone number of (619) 342-5734.  Based on your affiant's training and experience, pimps often have one prostitute that works for them that is in control of all the other prostitutes and tells them what to do. This individual is called a "Bottom" or a "Bottom Bitch."  The telephone contact "Trench Bitch" is a variant of the term Bottom Bitch.

35.      On or about March 3, 2021, your affiant conducted open source Internet searches for the cellular provider for telephone number (619) 342-5734.  The results listed T-Mobile Inc. as the provider.

36.      On October 24, 2020, Riley sent a text message to telephone number (619) 342-5734 stating "What's your app number again" and "And send pics."  Based on your affiant's training and experience, individuals involved in commercial sex acts and those involved in posting commercial sex advertisements or ads online, often use telephone numbers that utilize the Internet, also known as Voice Over Internet Protocol (VoIP) telephone numbers.  There are several companies that provide these services such as

13

Google Voice and TextNow. These VoIP telephone numbers work with a user's existing cellular telephone and do not interfere with the telephone number assigned to the device by the cellular provider. The user can send and receive telephone calls and text messages utilizing the VoIP number just as they would with the telephone number assigned by the cellular provider. In reference to Riley asking for an app number, he was asking the recipient of his text message for the VoIP number used for posting ads online and for coordinating commercial sex dates. Additionally, your affiant knows the term "date" is commonly used by those engaged in prostitution related activities to describe the period of time the prostitute is with a paying customer. The user replied, "Why u trynna post an ad?" Riley replied, "More clientele multiple sources." The user then provided telephone number (213) 436-3270. The user also provided an image depicting a black female sitting in a chair holding a black cellular telephone in her hand. The female's breasts are fully expose and there is a yellow happy face emoji covering the female's face. The user later asked to see the ad posted by Riley. Riley sent a screenshot of an ad which had an Internet address at the top of the ad showing "skipthegames.com" and the ad title showing "SUGA HERE COM PLAY." Based on your affiant's training and experience, the website skipthegames.com is a known website utilized by pimps and prostitutes to post advertisements for commercial sex. There were two images depicted in the ad. One of the images was similar to the picture previously sent to Riley of the black female sitting in the chair. However, the image depicted in the ad did not have the yellow faced emoji covering the female's face and the female's face was fully exposed. Your affiant knows the individual depicted in the image to be SM. Telephone number (213) 436-3270 was also included in the ad.

14

37.     On or about March 22, 2021, your affiant conducted open source Internet searches for the cellular provider for telephone number (213) 436-3270.   The results listed Bandwidth.com as the provider.   A Grand Jury subpoena was subsequently served on Bandwidth.com for records regarding that telephone number.   Bandwidth.com replied that although the telephone number was utilized on the Bandwidth.com network, the number was assigned to their wholesale customer TextNow, Inc.

38.     On October 24, 2020, Riley send a text message to SM stating "Look ima send you some clientele just answer the phone.  Do a couple car dates first and give me the bread ima get the room.  Don't cover your face.  Tricks don't like that."  SM replied "Y u didn't tell me tht earlier?"  Riley said "That's why I told you to take new pics."  SM asked "Like naked pictures?"  Riley replied "Yeah."  Based on your affiant's training and experience, car dates refer to when an individual is interested in commercial sex and drives around looking for prostitutes on the Blade.  Once they find a prostitute, they pick them up and then perform the sexual act in the car.  A "Blade" is a street or location where prostitutes are known to work or walk the street and solicit individuals for commercial sex.  Pimps also often use code words to hide or conceal their actual meaning.  In this case, Riley used the word "bread" to refer to cash or money.

39.     On December 8, 2020, Riley sent a text message to SM which contained a close-up video of SM giving oral sex to a black male.  SM later sent a text message to Riley with a video of a black male having vaginal intercourse with a black female.  The female is on her knees and elbows with her back facing the male.  The male has a tattoo on his left arm which is similar in appearance to the tattoo depicted in the photographs taken by SPD of Riley's left arm on or about December 21, 2020.

40.     On December 18, 2020, SM sent a text message to Riley which contained an image of two black females kneeling on a bed.  One of the females, known by your affiant to be SM, is wearing a white bra and black underwear.  She is grabbing her breasts with both of her hands.  The other female, matching the appearance of LM, is wearing a black bra and purple underwear.  She is grabbing her breasts with both of her hands.

41.     On December 19, 2020, Riley sent a text message to SM and stated "Okay and you got a 2 girl play in about 30 min."  Based on your affiant's training and experience, a "2 girl play" or a "2 girl special" is a term used to describe a particular type of date.  In this instance, it means there are two girls present during the date and performing the sexual acts instead of just one girl.  Riley then told SM to bump the two-girl special ad with her and JM.  Based on your affiant's training and experience, the term "bump" in this case refers to when an advertisement for commercial sex is posted to an online website such as skipthegames.com or megapersonals.com, and the bump refreshes the ad so it appears at the top of the search results.  Riley later told SM to bump the ad of her and LM.

42.     On December 20, 2020, Riley sent a text message to SM and asked if LM was on the team.  SM replied, "Yea but she can only trap on the weekends."  Based on your affiant's training and experience, the term "trap" refers to being involved in prostitution related activities.  SM later said LM was doing a date.  Riley asked "By herself?"  SM stated "No."  Riley stated "Tell her come do one w us."  SM said "She said she don't fucc pimps she make money for I asked her already."  Riley said "I'm not a pimp."  SM replied "I told her already."  SM then stated "But in her eyes u a pimp to her cuz she pays u."  Riley later said "And I might leave stanky out here."  Based on previous text messages sent between SM and Riley, your affiant believes stanky to be JM.  SM previously told Riley

16

how much JM stinks and that she smells bad and that she is not clean. Riley then stated "I told her we going to Arizona and if she was tryna come we was gon come back Thursday so y'all be w y'all family for Christmas. And she hon be like nah she still wana go home. Be like bitch you better come unles you don't want yet beat up got the shit you did." Riley later said "Tell her and she don't got no choice to go to Arizona."

43.     On December 20, 2020, Riley sent a text message to SM stating "Somebody 8 min away." SM replied "For who?" Riley said it was for her and LM. Riley then asked if NO was out of the room and SM said she was just now leaving the room.

44.     On December 21, 2020, Riley sent a text message to telephone number 520-779-0241 which stated "Wassup?" The user replied "Hey babe what's up?" Riley then said "You know where the blade at out here?" The user replied "27th and Indian School and 51st and McDowell." Based on your affiant's training and experience, there is a Blade in Phoenix, Arizona that is on 27th Avenue and stretches between W. Northern Avenue and Thomas Road. There is also a Blade in the vicinity of N. 51st Avenue and W. McDowell Road.

45.     On December 21, 2020, at approximately 2:23 p.m., SM sent a text message to Riley which stated "Call me jasmine." At approximately 3:20 p.m., SM sent another text message to Riley which stated "I'm getting arrested." Your affiant reviewed the SPD police report and noted that the initial incident was reported to SPD at approximately 1:41 p.m.

46.     Your affiant reviewed the digital extraction for the iPhone 7 Plus cellular telephone belonging to JM. During the review, your affiant reviewed the "Extraction Summary" and noted the device was associated with several Apple IDs. One of the Apple IDs listed was

17

pattersonjoi05@icloud.com.

47.     During the review of the digital extraction of the JM's cellular telephone, a text message was sent by Riley on December 3, 2020, to JM at Apple ID account pattersonjoi05@icloud.com. Riley stated "What y'all doing?" and "Come drop the bread off when you off to the car." JM replied, "Ok."

48.     On December 10, 2020, Riley sent a text message to JM stating "You got a date coming in 10 minutes." JM replied "Ok." Approximately 35 minutes later, Riley then stated "lmk when you done." JM replied "I'm done." Based on your affiant's training and experience, pimps are very specific about the time paid for by customers. Pimps do not want a customer spending more time with their prostitute than they paid for. Pimps and their prostitutes are also usually in constant communication before, during, and after the date. This lets the pimp know when the customer arrived, that the customer paid, and that the customer left after the date was completed. In this instance, Riley is checking with JM to know when the customer left after paying for the date.

49.     On December 11, 2020, Riley sent a text message to JM stating "Dude who coming 100 for 20 min." Riley then said "Lmk when he make it in." JM replied "He just got here and gave $120." Riley said "20 min." JM replied "Ok I set a timer."

50.     On December 22, 2020, Riley was stopped and detained at the entrance to the NBSD as he was arriving back on base. Naval Criminal Investigative Service (NCIS) Special Agent (SA) Josh Estep subsequently contacted Riley and advised him of his rights via the Military Suspect's Acknowledgment and Waiver of Rights Forms. Riley granted SA Estep consent to search his barracks room located on the NBSD as detailed in the Permissive Authorization for Search and Seizure (PASS) form and evidenced by Riley's

signature on the form.

51.     During the search of Riley's barracks, SA Estep located, among other things, a Samsung cellular telephone that was located on the nightstand next to Riley's bed.  On January 25, 2021, SA Estep conducted an analysis of the Samsung cellular telephone. During his analysis, there was a telephone contact listed as "Daddy" with an associated telephone number of (504) 813-7568.  This number is known by your affiant to be associated with Riley's iPhone XS Max cellular telephone.  SA Estep also identified a contact listed as "JAZMINE" with associated telephone number (619) 342-5734..  This number is known by your affiant to be associated with SM.  SA Estep determined that the Samsung cellular telephone had an associated TextNow number of (619) 597-1860.  SA Estep observed nude and lewd female images that were sent to the TextNow number from Riley's iPhone XS Max cellular telephone.  SA Estep also observed various text messages indictive of prostitution related activities.

52.     On February 5, 2021, SA Estep conducted an interview of LM.  During the interview, LM said that on an undisclosed day she received a telephone call from SM and Riley utilizing Facebook Messenger.  LM told Riley she was sixteen years of age and SM responded "She can lie about her age though."  LM then travelled to the NBSD because SM lived with Riley on base.  LM provided her cellular telephone number as (619) 763-7177.

53.     On or about March 3, 2021, your affiant conducted open source Internet searches for the cellular provider for telephone number (619) 763-7177.  The results listed Metro PCS as the provider.  Your affiant knows that Metro PCS and T-Mobile Inc. merged in 2013, and all requests for information from Metro PCS is handled by T-Mobile Inc.

54.     LM continued by saying that when she arrived at Riley's room, LM and SM changed clothes and took pictures. The pictures were of LM and SM in their bras and underwear. LM asked SM not to post the pictures, but LM thought SM posted the pictures to Snapchat using Riley's cellular telephone. SM then told LM the three of them were going to Los Angeles to attend a party. LM agreed to go to Los Angeles providing she could return home that night. Once they left NBSD, they stopped in El Cajon, California and picked up JM. LM asked JM "You do this?" to which JM replied affirmatively. LM clarified she knew SM and JM were "hoeing." Based on your affiant's training and experience, the term "ho" is in reference to a prostitute and the term "hoeing" is in reference to actively being involved in prostitution related activities.

55.     Upon arriving in Los Angeles, Riley, SM, LM, and JM checked into a hotel. SM advised the party had been canceled. LM indicated she wanted to return home because she knew SM prostituted and LM was not trying to do that. When LM said she wanted to go home, "they" took her cellular telephone away from her. SM then told LM the females were going to "bust dates." LM explained that "bust dates" meant to have sex with guys for money. LM told SM she did not bust dates anymore and SM said "If you wanna go home, you have to now." LM felt she had no choice so she made money for them.

56.     LM thought Riley tracked everyone that was on the Blade by utilizing the Find My iPhone feature. Riley also provided SM, JM, and LM twenty-three condoms each for sex on the Blade. LM said each female had vaginal sex for money twenty-three times that night. LM said the tricks paid either LM in cash or paid Riley directly utilizing CashApp. The money she made was provided to Riley.

57.     The following night, they continued to bust dates. At approximately 1:00 a.m. on

20

Saturday, Riley demanded the females pack up and put their belongings into his vehicle. LM said she did not want to go to Arizona, but she was "pushed" into the vehicle. LM stated Riley picked up an unknown seventeen-year-old female at a gas station before leaving Los Angeles.

58.     LM thought they arrived at a hotel in Phoenix around 7:00 a.m. Everyone went to sleep once they checked-in to the hotel. LM stated that at some point, some maintenance men entered her hotel room and she told them she needed help and she did not want to be there. LM also called her mom to pick her up. Soon after, LM was picked up by her mom.

59.     LM stated that prior to this incident, she had watched movies and played drinking games with SM in Riley's room on several occasions. She recalled that multiple times she heard Riley talk to SM about car dates and paying specific amounts of money. LM said Riley also set up dates for SM on MegaPersonals utilizing his cellular telephone. LM thought SM used the TextNow application to place ads for dates. LM has not heard Riley threaten SM, but Riley slapped SM while they were in Los Angeles because SM did not bring in enough money.

60.     SA Estep showed LM pictures from the Samsung cellular telephone, previously seized from Riley's barracks, for identification purposes. LM positively identified a nude image of a black female as SM.

61.     On May 28, 2021, Detective Halterman provided your affiant with the Body Worn Camera (BWC) videos from SPD's initial response to the Days Inn and Suites hotel on December 21, 2020. On June 8, 2021, your affiant reviewed the BWC video entitled "Felony_2_of_7.mp4." Between timestamp 0:23 and 1:47, SM and Riley are observed sitting outside of a hotel room. During that time, SM has in her possession two cellular

21

telephones.  One of the cellular telephones has a white front and appears to be an Apple iPhone.  The other cellular telephone appears to be red in color and slightly larger than the white iPhone.  On June 8, 2021, your affiant physically viewed the cellular telephones seized by Detective Halterman that were attributed to SM and they match the appearance of the cellular telephones depicted in the BWC video that were in SM's possession.

## CONCLUSION

62.     Based on training and experience, you affiant knows that pimps and prostitutes rely heavily on cellular telephones in order to conduct business.  Pimps use cellular telephones to communicate with those they are prostituting and to tell them when and where to go.  Pimps also use cellular telephones to connect to the Internet to post commercial sex advertisements for their prostitutes as well as to communicate with potential customers.  Prostitutes also use cellular telephones in the same manner.  Prostitutes use cellular telephones to communicate with their pimp, to post commercial sex advertisements, and to communicate with potential customers.  Cellular telephones are also used by both pimps and prostitutes to take sexually explicit photographs to be use in the posted advertisements or to send those photographs to potential customers.  Your affiant is also aware it is common for pimps and prostitutes to utilize multiple cellular telephones in the course of their business.  For example, a prostitute may utilize one cellular telephone to communicate with their pimp and then use one or more cellular telephones to post sexually explicit advertisements, communicate with customers, and to arrange dates.

63.     Based on the foregoing, your affiant submits there is probable cause to believe that the items listed in Attachment B, which constitute evidence and/or instrumentalities of violations of Title 18 U.S.C § 1201 (Kidnapping), Title 18 U.S.C § 2251 (Sexual

22

Exploitation of Children),   Title 18 U.S.C § 2252 (Activities Involving the Sexual

Exploitation of Children), Title 18 U.S.C § 2422(b) (Coercion and Enticement), and Title

18 U.S.C § 2423 (Transportation of a Minor With Intent to Engage in Illegal Sexual

Activity), are likely to be found in contents of the **Target Cell Phones** further described in

Attachment A.  I respectfully request that this Court issue a warrant to search the property

specified in Attachment A for the items specified in Attachment B.  Because the **Target**

**Cell Phones** are in law enforcement custody, your affiant requests permission to execute

the warrant at any time.

64.       This Court has jurisdiction to issue the requested Warrant because it is "a court of

competent jurisdiction" as defined by 18 U.S.C. § 2711.  *See* 18 U.S.C. § 2703(a),

(b)(1)(A), (c)(1)(A).  Specifically, the Court is "a district court of the United States" that

"has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).


I declare under penalty of perjury under the laws of the United States of America that the

foregoing is true and correct.

Special Agent Blake H. Childress
Federal Bureau of Investigation


Sworn before me telephonically ___17___ day of ___June___, 2021.

HONORABLE EILEEN S. WILLETT
United States Magistrate Judge